UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| AMANDA I., | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
| v. | )   1:22-cv-00183-JAW |
| | ) |
| KILO KIJAKAZI, Acting Commissioner of Social Security, | ) ) |
| | ) |
|     Defendant | ) |

## REPORT AND RECOMMENDED DECISION

On Plaintiff's application for disability insurance benefits under Title II and supplemental security income benefits under Title XVI of the Social Security Act, Defendant, the Social Security Administration Commissioner, found that Plaintiff has severe impairments but retains the functional capacity to perform substantial gainful activity. Defendant, therefore, denied Plaintiff's request for disability benefits. Plaintiff filed this action to obtain judicial review of Defendant's final administrative decision pursuant to 42 U.S.C. § 405(g).

Following a review of the record, and after consideration of the parties' arguments, I recommend the Court vacate the administrative decision and remand the matter for further proceedings.

## THE ADMINISTRATIVE FINDINGS

The Commissioner's final decision is the February 15, 2022, decision of the

Administrative Law Judge.  (ALJ Decision, R. 18).[1]  The ALJ's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims, 20 C.F.R. §§ 404.1520, 416.920.

The ALJ found that Plaintiff has severe, but non-listing-level impairments consisting of degenerative disc disease (lumbar spine), obesity, and anxiety disorder.  The ALJ found Plaintiff had the residual functional capacity (RFC) to perform light work with the following limitations:  she can stand and/or walk for six hours and sit for six hours during an eight-hour day; she should be allowed to change positions for three minutes after every sixty minutes of continuous sitting or standing; she can frequently climb ramps and stairs; can occasionally climb ladders, but never climb ropes or scaffolds; can occasionally stoop, kneel, crouch, and crawl; can never be exposed to dangerous machinery, hazardous heights, or extreme cold; can occasionally be exposed to atmospheric conditions, but never in excessive amounts; can understand, remember, and carry out simple instructions; can be in the vicinity of, but have no interaction with the public; works best in small familiar groups of no more than ten individuals; and can adapt to simple changes in the work environment.  (R. 25.)

After considering Plaintiff's age, education and work experience, and the testimony of a vocational expert (VE), the ALJ concluded that Plaintiff can perform substantial gainful activity existing in the national economy, including the representative occupations of garment sorter, ticketer/tagger, and label coder.  (R. 32.)  The ALJ

---

[1] Because the Appeals Council found no reason to review that decision (R. 1), Defendant's final decision is the ALJ's decision.

determined, therefore, that Plaintiff was not disabled. (R. 33.)

## STANDARD OF REVIEW

A court must affirm the administrative decision provided the decision is based on the correct legal standards and is supported by substantial evidence, even if the record contains evidence capable of supporting an alternative outcome. *Manso-Pizarro v. Sec'y of HHS*, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); *Rodriguez Pagan v. Sec'y of HHS*, 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Sec'y of HHS*, 647 F.2d 218, 222 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

## DISCUSSION

Plaintiff contends the ALJ's RFC determination is not supported by substantial evidence on the record, the ALJ failed to consider material evidence, and the ALJ erred in her analysis of whether work Plaintiff can perform exists in significant numbers in the national economy.

**A.   RFC**

Plaintiff's principal challenge to the ALJ's RFC determination focuses on Plaintiff's non-physical abilities and limitations. An "ALJ must measure the claimant's capabilities, and 'to make that measurement, an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be

3

apparent even to a lay person.'" *Manso-Pizzaro*, 76 F.3d at 17 (quoting *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 7 (1st Cir. 1991)). The ALJ discounted the opinions of the treating mental health professionals, Alyssa Radmore-Spear, LCSW, and Melinda Morissette, PMHNP-BC, and found the state agency consultants' opinions to be partially persuasive.

LCSW Radmore-Spear, Plaintiff's therapist, using what the ALJ characterized as a "numerical rating form," opined that Plaintiff experiences marked limitations in (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting and managing herself. (R. 30, 766-67.) LCSW Radmore-Spear also submitted a letter with the form.

The ALJ discounted LCSW Radmore-Spear's opinions because the opinions were not supported by medical or clinical findings. The ALJ noted that LCSW Radmore-Spear's opinions consist largely of a list of diagnoses, and her conclusions were contradicted by other evidence in the record, including Plaintiff's generally unremarkable mental status exams,[2] her conservative treatment, and her improvement with medication and therapy. (R. 30.) The ALJ characterized LCSW Radmore-Spear's opinion that Plaintiff would be absent from work more than four days per month as speculation because it was evidently based on Plaintiff's subjective report that she typically called out of work one to two days per week in her last job due to anxiety-related symptoms. (R. 30,

---

[2] The reports of the status exams describe Plaintiff variously as exhibiting normal behavior and appearance, as cooperative and friendly with good eye contact, "ok" mood with some anxiety, affect ranging from constricted to appropriate, and with logical, linear, goal direct thought processes, good concentration, full orientation, and intact memory (R. 30, citing R. 821-22, 826-27, 830-31).

citing R. 765.)

The ALJ found the opinion of PMHNP Morissette unpersuasive for similar reasons. (R. 30-31.) The ALJ observed that PMHNP Morissette also used a numerical rating form and did not include the reasoning for her opinions. (R. 30.) The ALJ dismissed PMHNP Morissette's view that Plaintiff would be absent from work four or more days per month as speculative, noting that the opinions failed to account for Plaintiff's reported improvements with medication and therapy, or for mental status exams that showed good concentration. (*Id.*) The ALJ concluded PMHNP Morissette's opinion was inconsistent with her objective observations of Plaintiff and her statement that she "discussed disability issues [with Plaintiff] and how the functional assessment is done and how I feel that she most likely does not [meet] the criteria from a psychiatric perspective." (R. 31, 839.)

The ALJ found the opinions of the state agency psychological consultants to be somewhat persuasive. The ALJ perceived an inconsistency in the consultants' assessment of a mild impairment in Plaintiff's ability to understand, remember, or apply information, and their limitation of Plaintiff to simple, routine matters, and simple tasks. (R. 29.) The ALJ resolved the inconsistency by assessing Plaintiff with a moderate limitation in understanding, remembering, or applying information affecting her ability to understand and remember complex information, which finding was supported in part by Plaintiff's educational records. (R. 24, 29.) The ALJ adopted the consultants' opinion in limiting Plaintiff to carrying out simple instructions in her RFC. (R. 25, 29.) The ALJ also "adjusted for clarity" the consultants' limitation of Plaintiff to work with a small group of

5

coworkers by specifying the number of coworkers to no more than ten. (R. 25, 29.)

Contrary to Plaintiff's argument, the ALJ did not err. An ALJ's responsibility is to determine the weight to afford all evidence, including expert evidence. The ALJ assessed the expert evidence and supportably relied on the opinions of the state agency consultants. The fact that the ALJ imposed a more restrictive limitation than the state agency consultants imposed is not error. *Kristina D.B. v. Berryhill*, No. 18-cv-00088-JHR, 2019 WL 1407407, at *4 (D. Me. Mar. 28, 2019); *see also Lee v. Berryhill*, No. 2:17-cv-00040-JHR, 2018 WL 793595, at *5 (D. Me. Feb. 8, 2018) (ALJ can give the claimant the "benefit of the doubt" and recognized limitations in the RFC finding beyond those expressed in an opinion that the ALJ might otherwise rely on as substantial evidence of a less restrictive RFC); *Soto v. Colvin*, No. 2:14-cv-28-JHR, 2015 WL 58401, at *3 (D. Me. Jan. 5, 2015) ("A claimant may not obtain a remand on the basis of an RFC that is more favorable than the evidence would otherwise support."). The ALJ's RFC assessment, therefore, is supported by substantial evidence.

**B.     Absenteeism**

Plaintiff argues the ALJ did not consider records from Plaintiff's experience with her last employer, which records allegedly demonstrate that her condition caused her to miss work frequently.

As explained above, LCSW Radmore-Spear and PMHNP Morissette asserted that Plaintiff would miss work more than four days each month. While the ALJ acknowledged Plaintiff's self-report that in her last job, she missed multiple days of work due to her anxiety, the ALJ noted (a) that Plaintiff's anxiety was treated with medication

and counseling, without inpatient or partial outpatient treatment, crisis services or documented episodes of decompensation, (b) that Plaintiff conceded she enjoyed not working and being home to take care of her family, and (c) that her husband had encouraged her to "'consider filing for disability so that she can stay home with the kids full-time.'"  (R. 28, quoting and citing R. 596, 599.)[3]

Prior to the administrative hearing, Plaintiff submitted work records regarding her absenteeism during her last job.  During the hearing, the ALJ requested that Plaintiff re-submit the records in redacted form because one page had information regarding other employees.  (R. 46.)  Plaintiff resubmitted the records (*see* R. 233-326), but the ALJ stated in her decision that "it did not appear" to have been done.  (R. 18.)  The ALJ did not otherwise reference or discuss the records.

Defendant does not contest Plaintiff's claim that the ALJ erroneously found that Plaintiff did not resubmit the evidence.  Defendant argues that because the records were marked as an exhibit (8D), the ALJ should be presumed to have reviewed them, citing *Chapman v. Colvin*, No. 1:16-cv-00231-JDL, 2016 7441609, at *3 (D. Me. Dec. 26, 2016) (*aff'd*, Feb. 10, 2017).  Any presumption is rebutted by the ALJ's statement that the records were not resubmitted.  The ALJ does not discuss the records at any other point in her decision.  The record does not support a finding that the ALJ considered the records.

---

[3] The ALJ also observed that Plaintiff consistently presented to counselling sessions and, pre-pandemic, attended physical therapy and other appointments and her children's school meetings.  (R. 28.)  Although Plaintiff reported some anxiety related to her family dynamic, financial stress and pandemic-related concerns, providers consistently described her as engaged, talkative, well-groomed, and appropriately dressed.  (*Id.*)

Defendant also contends that, even if the ALJ failed to consider the employment records, the error is harmless because, although the records reflect Plaintiff's absences (leading to her eventual termination for "job abandonment (R. 235)), the records do not demonstrate that the absences were due to Plaintiff's anxiety. Defendant argues the records reflect that Plaintiff was absent from work, or requested time off, for a variety of reasons, including shoulder pain, flu-like and cold symptoms, upset stomach, and her child's healthcare needs. (*See* R. 305, 313, 315, 317, 320, 32-24, 326.) In other words, Defendant contends the records do not support Plaintiff's claim. The medical records associated with the absences are part of the records referenced by the ALJ in the decision. (*See* R. 22, 24, 31.)

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Plaintiff contends that Defendant's argument fails because "a reviewing court cannot affirm an agency's decision on the basis of a post hoc rationalization but must affirm, if at all, on the basis of a rationale actually articulated by the agency decision-maker." *Day v. Astrue*, No. 1:12-cv-141-DBH, 2012 WL 6913439, at *10 (*aff'd*, Jan. 18, 2013) (citing *SEC v. Chenery Corp.*, 332 U.S. 194 (1947)) (other citations and internal punctuation omitted). An exception to the so-called *Chenery* rule, however, "exists when a remand will amount to no more than an empty exercise because, for example, application of the correct legal standard could lead to only one conclusion." *Id*.

The exception was applied in *Gregory T. v. Berryhill*, No. 1:17-cv-00445-LEW, 2018 WL 6012222 (D. Me. Nov. 16, 2018) (aff'd Dec. 3, 2018), where the commissioner

argued that the ALJ's failure to address the opinions of two experts regarding the plaintiff's ability to balance was harmless error. The court explained:

> At oral argument, the plaintiff's counsel protested that the commissioner's harmless-error argument ran afoul of the so-called "*Chenery* rule." However, as the commissioner's counsel rejoined, an argument that an error is harmless is not a bid for affirmance on the basis of a rationale not articulated by the decision-maker but, rather, an assertion that remand is unwarranted in the absence of harmful error.

2018 WL 6012222, at *6 (citations omitted).

Here, the ALJ supportably discounted Plaintiff's reports that she could not leave her house due to anxiety and missed many days of work due to her anxiety. The ALJ did not question the number of workdays Plaintiff missed. The ALJ cited the reasons for the absences, including Plaintiff's reports to providers that she enjoyed not working and being home to take care of her family, that her husband encouraged her to apply for disability benefits so that she could continue to stay home, that Plaintiff was able to go to other events consistently, including therapy sessions, school meetings, and physical therapy appointments, and that Plaintiff did not receive intensive mental health treatment or have any decompensation episodes.[4] The records from Plaintiff's prior job do not contradict the ALJ's findings. The fact that the ALJ erroneously concluded that Plaintiff had not resubmitted the records, therefore, was at most harmless error.

## C. Job Numbers

Plaintiff contends the VE's testimony regarding the number of jobs available in the national economy is unreliable because the ALJ referenced the number of jobs for

---

[4] The ALJ also noted Plaintiff was eventually discharged from aquatic therapy for nonattendance due to her children's schedules, not anxiety symptoms. (R. 28, citing 596, 599.)

aggregated job groups rather than for the identified jobs Plaintiff could perform.

At step 5 of the evaluation process, the commissioner has the burden to establish that the jobs a claimant can perform exist in the national economy in significant numbers, giving particular attention to the claimant's age, education, work experience, and RFC. 20 C.F.R. § 404.1520(a)(4)(v), (g)(1); *Goodermote v. Sec'y of HHS*, 690 F.2d 5, 7 (1st Cir. 1982). This burden is typically addressed through a combined reliance on the Medical-Vocational Guidelines, 20 C.F.R. Part 202, Subpart P, Appendix 2, and the testimony of a vocational expert, who is asked to consider one or more hypothetical RFC findings. *Goodermote*, 690 F.2d at 7; *Arocho v. Sec'y of HHS*, 670 F.2d 374, 375 (1st Cir. 1982). The Supreme Court noted that when offering such testimony, vocational experts "may invoke not only publicly available sources but also 'information obtained directly from employers' and data otherwise developed from their own 'experience in job placement or career counseling.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152-53 (2019) (quoting SSR 00-4p, 65 Fed. Reg. 75760 (2000)).

The VE testified that Plaintiff could perform the jobs of garment sorter, Dictionary of Occupational Titles (DOT) 222.687-014, with an estimated 189,000 jobs in the national economy; ticketer/tagger, DOT 222.687-018, with an estimated 1,430,000 jobs; and label coder, DOT 920.587-014, with an estimated 398,000 jobs. (R. 71-72.) The VE further testified that she obtained the estimated job numbers using Job Browser Pro vocational software, version 1.7. (R. 73, 74.) She stated that the job numbers she provided were not based on the specific DOT jobs she identified but were based on aggregate numbers for all jobs within the Standard Occupational Classification (SOC)

10

group including each specific job. (R. 73.) When questioned by Plaintiff's counsel, the VE testified that the numbers for each specific job obtained from Job Browser Pro were 901 for the garment sorter position, 1,698 for the ticketer/tagger and 16,151 for the label coder. (R. 74.) She stated that she did not make any adjustments to the specific numbers she obtained from Job Browser Pro; she asserted that her version of Job Browser Pro had updated the week prior to the hearing (July 15, 2021). (*Id*.)

After the administrative hearing, Plaintiff submitted an affidavit from David Meuse, M.S., C.R.C., dated July 28, 2021. (R. 496-97). Mr. Meuse contested the VE's initial use of aggregate job numbers because the SOC groups can encompass as many as 1,500 individual occupations at all exertional and education, training, and experience levels. (R. 497, ¶ 11.) As a result, Mr. Meuse maintained, "an estimate of the employment in an entire SOC group is likely to include many jobs that exceed the RFC limitations posed by the ALJ." (*Id*.) Mr. Meuse also asserted that the individual job numbers the VE provided were inaccurate because the relevant version of Job Browser Pro, version 1.7.2, reflects the following number of jobs for 2021: 181 for garment sorter, 731 for ticketer/tagger, and 2,033 for label coder. (R. 497, ¶ 12.) The ALJ was unpersuaded by the Meuse affidavit and rejected Plaintiff's contention that the VE's methodology was unreliable. (R. 32.)

If the VE's opinion was limited to the aggregate job numbers, the ALJ's reliance on the testimony and thus the ALJ's decision would likely not be supportable. *St. Pierre v. Astrue*, No. 1:10-CV-104-JAW, 2010 WL 5465635, at *3 (D. Me. Dec. 29, 2010) (*aff'd*, Jan. 19, 2011) (the VE's use of aggregate numbers, and the ALJ's reliance

on them, "accordingly cannot constitute substantial evidence that the three specific jobs at issue existed in significant numbers in the national economy."). The VE's testimony, however, was not limited to the aggregate numbers. When questioned by Plaintiff's counsel, the VE also cited the Job Browser Pro numbers for specific DOT jobs.

The VE testified that the jobs available for the specific occupations as defined in the DOT were 901 for garment sorter, 1,689 for tagger, and 16,151 for label coder. (R. 74.) The VE derived the job numbers from Job Browser Pro. Given this Court's determination that numbers of jobs "in the ballpark of 10,000 to 11,000 nationwide" are "significant … for purposes of step 5 analysis," *Vining v. Astrue*, 720 F. Supp. 2d 126, 137 (D. Me. 2010), and given the 16,151 available label coder jobs alone, the ALJ's finding as to the number of available jobs would be supportable.

Mr. Meuse and the VE provide conflicting evidence regarding the number of available DOT jobs in 2021. Both asserted they derived the numbers from the same source (Job Browser Pro), although they consulted different versions of Job Browser Pro. Where a conflict exists as to the number of jobs available when the job numbers are said to be derived from the same source, an ALJ must address the inconsistency if there is a "reasonable probability that the outcome of [the claimant's] proceeding would have been different" if the alternative job numbers were adopted by the ALJ. *White v. Kijakazi*, 44 F.4th 828, 836-837 (9th Cir. 2022) (remanding case for ALJ to resolve the inconsistency between the job-number estimates provided by the plaintiff and the commissioner).

Here, the total Job Browser Pro numbers provided by Plaintiff would not be enough jobs to support a determination that there were enough jobs available that

Plaintiff could perform with the assessed RFC. The decision as to which job numbers to adopt is thus potentially dispositive. The ALJ, therefore, must address the discrepancy between the numbers provided by the parties.

A VE is not limited to a particular source to support her or his opinion regarding the number of available jobs. For instance, a VE can base her or his opinion at least in part on experience. *See Pressey v. Berryhill*, No. 2:16-cv-00425-JDL, 2017 WL 2731308, at *6-7 (D. Me. June 25, 2017) (recommended decision, *aff'd* Aug. 28, 2017). In this case, when asked by the ALJ whether the job numbers to which she testified (initially in the aggregate based on SOC group numbers) are "based on your professional experience or do you do that using software," the VE did not reference her experience. Instead, she replied, "I utilize computer software program called Job Browser Pro and those numbers are provided or updated on a quarterly basis …" (R. 73.) She also testified that she does not make any adjustments to the specific numbers she derives from Job Browser Pro. (R. 74.) The discrepancy, therefore, cannot be resolved by reliance on the VE's experience.

The ALJ addressed the discrepancy by characterizing Mr. Meuse's assertions as "misleading" because he used Job Browser Pro 1.7.2 instead of version 1.7, which the VE used. (R. 33.) Defendant contends that by noting that Mr. Meuse used a different version of Job Browser Pro, the ALJ adequately addressed the issue. (Opposition at 20, ECF No. 15.) The ALJ, however, did not explain why the job numbers in version 1.7 were more accurate or valid than the job numbers in version 1.7.2.[5] The explanation is also of the

---

[5] Even if the VE's testimony regarding the job numbers could be construed to be based in part on the VE's experience, the actual numbers are derived from Job Browser Pro and the record lacks evidence as

not apparent on the record. While the VE testified that the version of Job Browser Pro she used was updated the week before the administrative hearing (R. 74), the sequential numbering of the versions used by Mr. Meuse (1.7.2) and the VE (1.7) suggests the version used by Mr. Meuse might be a more recent version than the one used by the VE. Without further development of the record, a decision-maker cannot supportably conclude that one version is more current and accurate than the other. The discrepancy in the job-number estimates thus was not adequately addressed. Accordingly, remand is warranted.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court vacate the administrative decision and remand the matter for further proceedings.

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

Dated this 9th day of February, 2023.

/s/ John C. Nivison  
U.S. Magistrate Judge

---

to how the VE's experience would support the conclusion that the version of Job Browser Pro used by the VE is more current and accurate than the version used by Mr. Meuse.